## Case No. 15,537.

### UNITED STATES v. The KITTY.

[Bee. 252.] [1]

District Court, D. South Carolina. Feb. 1. 1808.

SLAVE TRADE—REMISSION OF FORFEITURES.

Forfeiture under the act of congress prohibiting the importation of negroes after January 1, 1808. may be remitted by this court in cases of extreme hardship.

[Cited in Furniss v. The Magoun, Case No. 5.163.]

BEE. District Judge. This suit is instituted by Captain McNeil of the revenue cut-

1 [Reported by Hon. Thomas Bee, District Judge.]

ter Gallatin, against the schooner Kitty, for a breach of the first and seventh sections of the act of congress passed 2d March last, entitled "An act to prohibit the importation of slaves into any port or place within the jurisdiction of the United States after the 1st of January, 1808." It appeared in evidence, that the Kitty sailed from Charleston on the 19th November, 1806, bound to the coast of Africa. She arrived there on the 1st January following, at which time her crew consisted of the captain, two mates, one steward, and seven seamen. The second mate and one seaman died in February; another seaman died in August following. The steward ran away, and the first mate was discharged as an incorrigible drunkard; so that, in the month of August, the captain only and five of the crew remained. At this time they had purchased no more than thirty-two slaves; and such was the scarcity of provisions on the coast, that, till the beginning of November, they were threatened with famine. In July, the captain was taken ill, and continued so till the vessel sailed In August, the ship's papers were seized by the governor, and detained for a fortnight. In September a report of war with Great Britain obliged the vessel to run up the river to avoid being captured. In October, only two of the crew were fit for duty, and the vessel was so leaky as to be three weeks under repair; provisions for their return could not be procured till November; on the 16th of that month she sailed, and on the 16th January, 1808, was seized in Stono Inlet, near Charleston, by the captain of the revenue cutter. The libel prays condemnation of the vessel, as coming within the act of congress. The owners contend that this case, though within the letter, is not within the spirit of the act.

I have considered the evidence and circumstances of this cause with attention. It is not denied that the voyage was a legal one in its inception, and continued so for nearly fourteen months afterwards. The act by which the trade was made illegal was not passed till a long time after this vessel sailed; and there is no proof that knowledge of it ever reached the captain, till his return. But if the act had been known to him, unavoidable accident and invincible necessity prevented his sailing sooner. As it was, he might have got here in six weeks, which the prosecutor himself allowed to be no uncommon passage; but head winds and a winter's passage detained him a fortnight longer. If ever there was a case of hardship, occasioned by no fault of the party, this is one; and it is justly and humanely observed by Sir William Scott (1 C. Rob. Adm. 221) that "laws which would not admit an equitable construction, applicable to the inevitable misfortunes or necessities of men, or the exercise of a fair discretion under difficulties, could not be framed for human societies." By this principle I shall be guided in the present case, more especially as the act of congress upon which the suit is grounded expressly gives the court a discretionary power in extreme cases, of which this is surely one. I, therefore, dismiss the suit, but order that all the costs be paid by the claimant; for Captain McNeil, in this seizure and prosecution, did no more than obey a positive law, the directions of which he would have been criminal in neglecting.